IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


GARY MAX CHAMBERS                                                      PLAINTIFF


v.                                    Civil No. 6:18-cv-06091


JASON WATSON, Sheriff, Clark County,
Arkansas; DERRICK BARNES, Administrator,
Clark County Detention Facility; ROBERT JONES,
Deputy Sheriff, Clark County; OFFICER CHASE KERSEY;
OFFICER K. LOVE, Clark County Detention Facility;
DEPUTY NICK FUNDERBURK; DEPUTY PERRY;
DEPUTYANDREW SAMUELS;
DEPUTY NATE MORRISON; and
TOMMY WALDRON, Amity Police Department                    DEFENDANTS


## <u>REPORT AND RECOMMENDATION</u>

The Plaintiff, Gary Max Chambers, originally filed this *pro se* action on September 27, 2018, in the Eastern District of Arkansas pursuant to 42 U.S.C. § 1983.  (ECF No. 1, 2).  The matter was then transferred to this Court.  Plaintiff's application to proceed *in forma pauperis* has been granted.  Plaintiff filed an Amended Complaint on October 9, 2018, which was ordered to be served upon the Defendants.  (ECF No. 7, 8).

Before the Court are two motions:  the Clark County Defendants, which include Sheriff Jason Watson, Derrick Barnes, Chief Deputy Nick Funderburk, Robert Jones, Chase Kersey, Officer Love, Nate Morrison, Deputy Andrew Samuels, and Deputy Perry, filed a Motion for Summary Judgment on August 19, 2019.  (ECF No. 43).  Separate Defendant Tommy Waldron filed a Motion for Summary Judgment on August 26, 2019.  (ECF No. 47).  The Plaintiff has responded (ECF Nos. 71, 72, 73, 74, 75, 76) and the motions are now ripe for decision.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief

United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

## I.  FACTUAL BACKGROUND

Plaintiff's Amended Complaint sets forth three claims.  Plaintiff's first claim, which is stated against Sheriff Watson, Deputy Jones, Officer Kersey, Derrick Barnes, Officer Love, Deputy Nate Morrison, Deputy Andrew Samuels, Deputy Perry, and Chief Deputy Nick Funderburk,[1] is for "excessive force, police brutality, cruel and unusual punishment" with respect to an incident which occurred during the evening and early morning hours of April 20-21, 2018, while Plaintiff was incarcerated in the Clark County Detention Center (hereinafter "CCDC"). Plaintiff claims that the "officers woke me up in the middle of the night.  I was fully cooperative and most respectful.  Allowed officers to put hand cuffs and leg irons on me then severely beaten and mased and tazed then locked in a cop car and listened to the Sheriff threaten my life over the radio while mased."  (ECF No. 7).  The claim is stated against the Defendants in both their official and personal capacities.  *Id.*

Plaintiff's second claim is stated against only Separate Defendant Tommy Waldron. Plaintiff claims that on July 2, 2017, Waldron came to his house and "shot me with a tazer twice. He had no intention of calling this incident in.  He came to my house to use his gun and badge so I would lay down, and 2 other people could beat me up."  (ECF No. 7).  The claim is stated against Waldron in both his official and personal capacities.  *Id.*

Plaintiff's third claim is stated against only Robert Jones and is for "excessive force" with respect to an incident on April 20, 2018, in the CCDC at the time of Plaintiff's book-in.  Plaintiff claims that Jones "struck me repeatedly in the face with a closed fist and then filed battery charges

---

[1] Deputy Nate Morrison, Deputy Andrew Samuels, Deputy Perry, and Chief Deputy Nick Funderburk were identified and named in place of John Doe Defendants by the Plaintiff on November 18, 2018. (ECF No. 14, 18).

on me when he broke his hand on my face."  (ECF No. 7).  Plaintiff also claims that Jones "had false charges filed on me."  *Id*.  The claim is stated against Jones in both his official and personal capacities.  *Id*.

After reviewing the pleadings of all of the parties, I find the following facts established for purposes of considering these Motions for Summary Judgment:

On July 2, 2017, Plaintiff was booked into custody at the CCDC on charges of assault, battery, and criminal mischief.  (ECF No. 49-1).

According to Plaintiff's deposition testimony, Defendant Tommy Waldron came to his house around noon on July 2, 2017, with two civilian men.  (ECF No. 49-2).  Plaintiff testified that the two other men were Andrew Barrett and a man Plaintiff believed to be Andrew Barrett's father. *Id*.

Plaintiff testified that Waldron told him to lay down on the ground, and that he did so. (ECF No. 49-2).  Plaintiff testified that while he was laying on the ground Andrew Barrett and Barrett's father came running up within a few feet of him.  *Id*.  Plaintiff jumped up and grabbed a stick.  *Id*.  Waldron shot him with a taser.  *Id*.  Plaintiff testified that he ripped the wires out of the taser and was then shot with the taser again.  *Id*.  Waldron instructed Plaintiff to get back on the ground but Plaintiff refused and asked for another officer to be called.  *Id*.  Plaintiff had injuries at the time from an altercation earlier that day with Andrew Barrett.  *Id*.  During the earlier altercation, Plaintiff beat up Andrew Barrett and knocked the windows out of Barrett's car.  *Id*.

Plaintiff testified that after he refused to get back on the ground, Waldron pointed his gun at Plaintiff for approximately thirty (30) minutes.  (ECF No. 49-2).  After approximately thirty (30) minutes, police from Arkadelphia, Amity, Pike County, and Clark County arrived.  *Id*.  A game warden also arrived.  *Id*.  Plaintiff was arrested and charged with battery and criminal mischief.  *Id*.

With respect to his official capacity claim against Waldron, Plaintiff testified that Waldron "wouldn't have made that decision if Clark County or the City of Amity hadn't given him that gun and that badge and that Taser." (ECF No. 49-2).

On April 20, 2018, Plaintiff was booked into the CCDC on charges of possession of a controlled substance and possession of drug paraphernalia. (ECF No. 45-2). Also on April 20, 2018, after being taken into custody, Plaintiff was charged with impairing operation of a vital public facility, two counts of 2nd degree battery, and aggravated assault upon a certified law enforcement officer or an employee of a correctional facility. *Id.*

On April 20, 2018, Defendant Robert Jones submitted the following statement:

On 4/20/2018, I, Sgt. Robert Jones was working on an accident in the squad room and over herd (sic) Chambers arguing with the Jailers about going back into the block. Chambers cursed them for several minutes and then it appeared Chambers was going to comply and he and the jailers left the room.

A short time later I could hear Jailer Sam Burdett calling my name. I then herd (sic) him call out again and I made my way to the hallway where I saw Chambers on his back on top of Burdett and Jailer Stephen Parrott on top of Chambers struggling. I then ran to assist the jailers and as I got down to try and help get Chambers under control, Chambers punched me in the face and I punched him back. Chambers was finally shackled but continued to struggle as he was brought to his feet cause me to trip. Chambers was the put in the restraint chair until he calmed down.

During the struggle I received a broken finger, bruised ribs and the inside of my mouth cut. After Chambers was placed in the restraint chair, I, Sgt. Robert Jones, went to Baptist Medical Center ER for treatment along with Jailer Stephen Parrott due to blood being spit into his eye.

(ECF No. 45-4).

On April 20, 2018, Jailer Stephan Parrott filed the following incident report:

At approximately 1310 on April 20, 2018, I, Jailor Parrott, along with Jailor Burdett were in the booking room finishing up the booking process on detainee Gary Chambers. I took Detainee Chambers to the exam room so he can change into his orange and be searched. I had him strip down each piece of clothing and hand them to me for inspection then to be put in a box with his identification on it. I made him squat and cough for a total of three times due to the fact that the first two were not correct. Before detainee Chambers did the third squat, he started arguing and

complaining about actually having to squat and cough. He told me that "You're messing with the wrong motherfucker". He began raising his voice until Jailor Burdett came in and told him to calm down and he did complete the third and final squat and cough. We moved him to booking where he was informed to gather his things because he was headed to general population. He continued to argue and say "I'm not the motherfucker to mess with," directing those statements at me. He then asked Jailor Burdett for a cigarette and was informed that he would call and ask one of the investigators. Detainee Chambers continued to mouth off and took off his sandals calling me along the lines of a "fuckboy" and he is the "wrong motherfucker to mess with." Jailor Burdett and I told him to gather his things he was going to the back. He gathered his mat and blanket and we headed down the corridor. Once he got next to the visitation door Detainee Chambers threw down his mat, blanket and sandals and ran at me. I ducked his attempt to punch me and pushed him towards the corridor. Jailor Burdett grabbed Detainee Chambers and took him to the ground. I followed then to the ground as the jail staff attempted to restrain him. We called for Sergeant Jones to assist us. The jail staff was attempting to restrain him on the floor in the hallway when detainee Chambers struck Sergeant Jones in the face with his fist. The jail staff and Sergeant Jones shackled him and as the jail staff were leading him to the restraint chair Chambers spit a mixture of blood and saliva and struck me, Jailor Parrott, in the face. Detainee Chambers was led away to be put in the restraint chair.  The sheriff accompanied by other officers came in, and they took pictures of my face. Then Sgt. Jones and I proceeded to go the Hospital to be checked out.

(ECF No. 45-4).

On April 20, 2018, Jailer Sam Burdett filed the following incident report:

I jailor Sam Burdett was in the Squad Room talking to Sgt. Robert Jones when I heard some loud voices coming from the jail changing room. I walked back there to see if everything was alright and I then seen Jailor Stephen Parrott getting inmate Gary Chambers changed out for him to go back into the back. While inmate Chambers was getting changed out he was cussing and raising his voice and saying you're trying the wrong motherfucker today at Jailor Parrott which I assumed was because Jailor Parrott told him to squat and cough better than what he did. I then told inmate Chambers to calm down. He then began to get his jump suit on and then walk to the booking room. He then mentioned he was promised a cigarette by an investigator and I said back I don't know but I can find out and let you know. Jailer Parrott then told him to gather his things and go to the back and he said he wasn't going and he began to get angry I told him to calm down and I'll find out about the cigarette if you calm down and go to the back and I'll grab your hot tray if you get your mat and blanket. He agreed and Jailor Parrott began down the hall and inmate Chambers was behind him. Inmate Chambers then began to look like he was mouthing silently about Jailor Parrott behind his back he then kicked his flip flops off and dropped his mat and blanket and ran up behind Jailor Parrott and started hitting him with a closed fist. I then ran up behind inmate Chambers and grabbed

him and picked him and Jailor Parrott took them to the ground.  I then was trying to get Chambers arms so he wouldn't be hitting Jailor Parrott anymore. All three of us were on the ground. I had Chambers arms and I shouted out to Burt to get some assistance from Sgt. Robert Jones. Sgt. Jones then came to assist and I tried to grab my cuffs and Chambers began to kick me as I pulled my cuffs out. Chambers started to hit Sgt. Jones with a closed fist as well. I then got a cuff on Chambers while he was resisting.  Sgt. Jones kept telling him to give me his arm and to stop fight. I finally got him cuffed when Dispatcher Linda Raines came asked if we needed anything. Then get the shackles. She came back with the shackles and I put them on him as I held his legs down so he wouldn't knee me in the face. I then picked him up off the ground and had Sgt. Jones help me assist Chambers down the hall to the restraint chair. As I picked him up he spit in Jailor Parrotts face. Me and Sgt. Jones then put him up against the wall and then took him to the restraint chair and strapped him in as he mouthed the whole time. Inmate Chambers has violated rule A-1 and will be placed on a 30 day lockdown.

(ECF No. 45-4).

Video from the booking room camera of the incident on April 20, 2018 reflects the

following:

| | |
|---|---|
| 12:48:05 | Booking Room Video begins. |
| 12:48:12 | Plaintiff enters the booking room with Officer Burdett. |
| | Plaintiff initiates the first of several phone calls. |
| | During the calls, Plaintiff's leg irons are removed. |
| 13:02:34 | Officer Parrott and Plaintiff exit booking and enter the exam room. |
| | Officer Parrott instructed Plaintiff to "squat and cough" multiple times. |
| | Plaintiff can be heard cussing at the officer. |
| 13:04:23 | Officer Burdett enters the exam room |
| 13:05:35 | Both officers and Plaintiff return to booking. |
| | Plaintiff is visibly agitated and verbally aggressive. |
| | Officer Parrott attempts to get Plaintiff to go to the block. |
| | Plaintiff ignores that instruction |
| | Plaintiff continues to protest the squat and cough commands. |
| | Plaintiff requests to speak to the jail administrator or high ranking official. |
| | Officer Parrott instructs Plaintiff to follow him back to the block. |
| | Plaintiff refuses to follow him. |
| | Plaintiff says, "You aint gonna put me back there" |
| | Plaintiff says, "You better man the fuck up." |
| | Plaintiff kicks off his shoes. |
| 13:06:55 | Officer Burdett intervenes and tells Plaintiff to "chill out."  Officer Burdett convinces Plaintiff to go to the block. |
| 13:09:20 | Both officers and Plaintiff leave the booking room. |
| 13:09:32 | An unidentified person off camera can be heard yelling "Bert." |
| | Sergeant Robert Jones passes through the booking room. |

|   | Jail staff member enters booking room and grabs leg irons. |
|---|---|
|   | Jail staff member exits booking room. |
| 13:11:10 | An unidentified person off camera says "you don't fucking spit on people." |
| 13:11:24 | The officers, sergeant, and Plaintiff return to the booking room. |
|   | Plaintiff is placed in the emergency restraint chair. |
| 13:11:32 | Booking Room Video Ends |

(ECF No. 45-7).

Video from the hallway camera of the incident on April 20, 2018 reflects the following:

| 12:48:05 | Hallway Video begins. |
|---|---|
| 13:09:20 | Officer Parrott, Officer Burdett, and Plaintiff enter hallway. |
|   | Plaintiff drops mat and paperwork and kicks off his shoes. |
|   | Plaintiff runs up to Officer Parrott |
|   | Plaintiff attacks Officer Parrott from behind. |
|   | Officer Burdett runs toward and engages in the altercation. |
|   | Officer Parrott, Officer Burdett, and Plaintiff all fall to the floor. |
|   | The officers struggle to control Plaintiff. |
|   | Plaintiff is resisting being brought under control. |
|   | Sergeant Jones enters the hallway and engages in the altercation. |
|   | The officers continue to struggle with Plaintiff. |
|   | Plaintiff continues to resist. |
|   | Sergeant Jones strikes Plaintiff several times. |
|   | Jail staff member enters hallway. |
|   | Jail staff member exits hallway and returns with leg irons. |
|   | Officer Burdett holds Plaintiff's legs down. |
|   | Officer Parrott places leg irons on Plaintiff. |
|   | Plaintiff is brought to a standing position. |
|   | Plaintiff is walked back toward the booking room |
|   | Plaintiff makes a spitting motion toward Officer Parrott. |
|   | Officer Parrott backs away and wipes his eyes with his shirt. |
|   | Sergeant Jones and Officer Burdett take Plaintiff to the wall. |
| 13:11:21 | Officers have Plaintiff under control and walk him out of view of the camera. |
| 13:14:14 | Hallway Video ends. |

(ECF No. 45-7).

On April 23, 2018, Plaintiff was transferred to the Ouachita County Detention Center (hereinafter "OCDC"). (ECF No. 45-2) The OCDC booking officer recorded the following on the Inmate Medical Form, "Not allergic to any food or medication, taking codeine and

cyclobenzaprine, has broken bones (foot) damaged collar bone (left side), damaged vertebrae in neck.  Has staff on left forearm and left leg."  (ECF No. 45-3).  On July 22, 2018, Plaintiff was released to the Arkansas Department of Correction.  (ECF No. 45-2).

Plaintiff's deposition testimony reflects that on April 11, 2019, he was sentenced to forty (40) years for charges of battery, assault and impairing operations of a vital public facility.  (ECF No. 45-9).  Those charges related to the incident that occurred on April 20, 2018, in the hallway/booking room of the CCDC.  *Id*.  Plaintiff testified that he also had pending charges for negligent homicide, possession and possession of paraphernalia, each related to the wreck he had just before he came to the CCDC on April 20, 2018.  *Id*.

Plaintiff testified that he had neck and back problems that were related to his wreck or the beating he received from the police and that he had not received any treatment for those injuries.  (ECF No. 45-9).  Plaintiff testified that after the wreck, he was diagnosed with a sprained wrist and sprained neck.  *Id*.  Plaintiff was arrested following the wreck in the early morning of April 19, 2018, and the incident involving Jones occurred approximately twenty-four (24) hours later.  *Id*.  Prior to the incident but after the wreck, Plaintiff was taken by ambulance to the emergency room.  *Id*.

Plaintiff testified that when he got to the jail, he remembered lying down in the drunk tank.  (ECF No. 45-9).  Plaintiff testified that after he went to the drunk tank, he remembered doing an interview with Roy Bethel.  *Id*.  Plaintiff testified that he believed Officer Bethel was not concerned with the wreck because he was trying to get a meth bust.  He also believed Officer Bethel should have been more concerned about the wreck.  *Id*.

Plaintiff testified that he did not know how long his interview with Officer Bethel lasted, but that after the interview he went to his arraignment, after which they dressed him out and

searched him.  (ECF No. 45-9).  Plaintiff testified that while the officer was dressing him out, the officer was trying to irritate him.  *Id*.

Plaintiff testified that the officer kept running him mouth, that he came up behind the officer, that he pushed the officer and swung at the officer.  The officer hit the wall.  Plaintiff stated that Burdett then came up behind them, and that they all went to the ground.  (ECF No. 45-9).

Plaintiff testified that Robert Jones then came running up and Plaintiff got hit in the face eight or ten times.  (ECF No. 45-9).  Plaintiff testified that he had three cops striking him in the face and that he was resisting them.  *Id*.  Plaintiff testified that Burdett was trying to get him down and put handcuffs on him, but Parrott and Jones were striking him and using excessive force on him.  *Id*.

Plaintiff testified that he attacked Parrott, and struck Parrott in the face, but that he did not try to strike anyone else.   (ECF No. 45-9).

Plaintiff testified that it was wrong for Jones to use force against him because Jones struck Plaintiff in the face with a closed fist.  (ECF No. 45-9).  Plaintiff testified that he did not strike Jones.  *Id*.  Plaintiff testified that Jones's report said Plaintiff hit him first but the video showed otherwise.  *Id*.

Plaintiff testified that he was on the ground and he was not swinging his arms or moving his legs at all.  (ECF No. 45-9).  Plaintiff testified that he was trying to avoid Burdett's efforts to handcuff him by pulling his arms away but he was not striking anyone.  *Id*.

Plaintiff testified that he received a "ridiculous false charge" of battery against Jones and that it was dismissed.  (ECF No. 45-9).  Plaintiff testified that he was found guilty of battery against Parrot.  *Id*.

Plaintiff testified that he had pictures of Jones's broken hand and himself spitting blood down the hallway.  (ECF No. 45-9).  Plaintiff testified that he was spitting blood because he was choking and that he spit at the officers one time.  *Id.*

Plaintiff testified that excessive force and police brutality was the policy of Clark County. (ECF No. 45-9).  Plaintiff testified that he personally experienced police brutality from Clark County twice but did not know of any other instances of police brutality from Clark County in the past three years. *Id.*

Plaintiff testified that after this incident happened, he was placed in a restraint chair and several hours later was taken to the hospital.  (ECF No. 45-9).

Plaintiff testified that they took photographs of him and that he had seen those photographs. (ECF No. 45-9).  Plaintiff testified that the photographs did not show any injuries to him and he did not know why they did not show his injuries.  *Id.*  Plaintiff testified that the blood was coming from his mouth but it was not on his mouth.  *Id.*  Plaintiff testified that he did not recall anyone cleaning up his face.  *Id.*  Plaintiff testified that after a couple of hours, he was taken to the doctor at Arkadelphia Baptist Hospital.  *Id.*  At the hospital, they took x-rays of him and gave him some pills.  Plaintiff testified that the x-rays showed that he had a broken toe and he was given codeine. Plaintiff testified that he did not have any injuries to his face but he had lacerations in his mouth. *Id.*  Plaintiff testified that he probably had bruising on his face but he never saw any bruising on his face.  Plaintiff testified that after he went to the doctor, he went back to the drunk tank until the next shift change.  *Id.*

Plaintiff testified that, while he was in the drunk tank, a bunch of officers woke him up from a dead sleep, convinced him to put on handcuffs and leg irons, walked him out of the jail, put him in a police car, put a seatbelt on him and hit him in the face with mag lights.  (ECF No. 45-9).

Plaintiff testified that the cop that started the beating said his name was Ferguson but it might have been Morrison.[2]  *Id.*  Plaintiff testified that he complied with the officer's requests and did not say anything.  *Id.*  Plaintiff testified that he never tried to spit on anyone and that no one ever tried to put a mask on him.  *Id.*

Plaintiff testified that Officer Morrison started the beat-down, sprayed him and tased him. (ECF No. 45-9).  Plaintiff testified that at this point, he was completely defeated because he had lost the love of his life in the wreck.  *Id.*

Plaintiff testified that Officer Morrison put the seatbelt on him, said Plaintiff tried to bite him, and started hitting him in the face.  (ECF No. 45-9).  Plaintiff testified that after Officer Morrison hit him, the other officers started hitting him from both sides.  *Id.*  Plaintiff testified that the assault lasted about ten minutes but that he did not know how many times Officer Morrison struck him.  *Id.*  Plaintiff testified that he did not suffer any broken teeth but that he was bleeding from his mouth and nose and his left eye was almost swollen shut.  *Id.*

Plaintiff testified that during the assault, Officer Perry was leaning in the car from the driver's side and that Perry started attacking Plaintiff after his seatbelt was buckled.  (ECF No. 45-9).  Plaintiff testified that he did not know if more than one officer was leaning in the car on both sides because he closed his eyes and lowered his head, after the first couple of hits.  *Id.*  Plaintiff testified that he did not know how all the officers would have gotten in to strike him but that he was struck repeatedly and they were all responsible for his assault.  *Id.*

Plaintiff testified that Officer Morrison emptied his can of mace on him and shot him with his taser.  (ECF No. 45-9).  Plaintiff testified that after he was sprayed by Officer Morrison, Morrison stunned him with a stun gun to his leg, ribs and abdomen for several seconds each time.

---

[2] This Officer will be exclusively identified as Separate Defendant Morrison.  (ECF No. 31).

(ECF No. 45-9). Plaintiff testified that he did not see any marks on his skin or burned places on his clothes from the stun gun. *Id.*

Plaintiff testified that after he was sprayed, the officers closed the door to the car and that he was in the closed car for a long time. (ECF No. 45-9). While in the car, Plaintiff testified that Sheriff Jason Watson threatened him over the car radio. *Id.* Plaintiff testified that he heard Watson's voice over the radio and that Watson was talking bad to him and threatening him. *Id.* Plaintiff testified that he knew that it was Sheriff Watson that threatened him because Watson was at the wreck the night before and Plaintiff recognized his voice. *Id.* Plaintiff testified that he did not see Sheriff Watson on the night of the incident, but only heard him on the radio. *Id.* Plaintiff testified that he thought Watson sent the officers into his cell to drag him out and beat him up. *Id.* Plaintiff testified that he believed the other officers did what they did to him because Watson told them to do it. Plaintiff also testified that he believed the officers would not do something that they believed was wrong. *Id.*

Plaintiff testified that Jones came into his cell but that he did not know what else Jones did during the night incident. (ECF No. 45-9). Plaintiff testified that Officer Kersey was there. *Id.* Plaintiff testified that he was not alleging that Officers Jones or Kersey struck him during the night incident. *Id.* Plaintiff testified that Deputy Barnes was the jail administrator but that he was *not* there. *Id.* Plaintiff testified that although Barnes was not personally involved in this situation, he was responsible for the situation because it happened on his watch. *Id.* Plaintiff testified that Deputies Samuels and Funderburk were two of the eight officers that dragged him out of his cell. *Id.* Plaintiff testified that he did not know what Samuels and Funderburk did during the night incident. *Id.* Plaintiff testified that Deputy Love was the jailer on duty and that he opened the

door so the other officers could come into Plaintiff's cell. *Id.* Plaintiff testified that Love went with him to the car, but that he did not recall Love striking him. *Id.*

Plaintiff testified that the officers let him take a shower and that they then put him in the restraint chair for several hours. (ECF No. 45-9). Plaintiff testified that when they let him out of the restraint chair, he went back to the drunk tank until he went to court the next Monday. *Id.* Plaintiff testified that during that time, he took the codeine and other pills that the jailer gave him. *Id.*

Plaintiff testified that he had a copy of the restraint chair log but that there was no incident report that gave a reason for him to be in the restraint chair during the time of the night incident. (ECF No. 45-9). Plaintiff testified that he never received medical treatment for his injuries from the incident in the back of the police car. *Id.* Plaintiff testified that while he was in the police car, he was hit in the face and top of the head but he did not know if his shoulders or chest were injured. *Id.* Plaintiff testified that he asked for a million dollars in compensatory damages because that was the number he came up with and that he just came up with a number for punitive damages. *Id.*

Plaintiff testified that the CCDC would not give him a grievance form and that he did not file a grievance. (ECF No. 45-9). Plaintiff also testified that after he was taken back to the drunk tank, he asked for a grievance form but he did not know who he asked or when he asked for it. *Id.*

Plaintiff testified that he was transferred to Ouachita County after court on Monday. (ECF No. 45-9).

The CCDC chair log appears to reflect that Plaintiff was in the restraint chair from 22:58 on April 20, 2018 to 1:20 on April 21, 2018. (ECF No. 45-5).

The CCDC has specific policies in place concerning its grievance procedure. (ECF No. 45-6). It is the policy of the CCDC that if a Detainee needs to make a request or file a grievance,

the Detainee is to be given the appropriate form and is to return it to the Jailer on Duty. *Id.* Jailers are directed to note their receipt of the form, making sure to put their name, date, and time on the form, and then give it to the Administrator to be answered or passed on. *Id.*

It is the policy of the CCDC that upon the approval of the (Patrol) Shift Supervisor (in the absence of management), staff members will be authorized to use the emergency restraint chair (ERC) as necessary to control inmates who display behavior which creates a substantial risk of destruction of property or who place themselves and/or others in danger of physical harm. (ECF No. 45-6). It is the policy of the CCDC that the ERC will never be used to punish any inmate. *Id.*

It is the policy of the CCDC that the shift supervisor will be responsible for all appropriate incident reports, medical and mental health reports, observation reports and or any other written documents. (ECF No. 45-6). It is the policy of the CCDC that the inmate will be placed in an area of the facility that is monitored and recorded. *Id.* It is the policy of the CCDC that a written observation log will be maintained for any inmate who is placed in an ERC. *Id.* It is the policy of the CCDC that inmates will not be kept in restraints for no longer than four (4) hours except for medical cases. *Id.*

In support of his responses to the Defendants' Motions, Plaintiff has filed three affidavits. (ECF No. 75, 76, 77). Plaintiff states "I, Gary Max Chambers, know that I did in fact ask for grievance forms a few times while I was in jail in Clark County between April the 19th and April 23rd of 2018. I do not remember exactly who I asked or when. I remember asking while I was in the restraint chair, but not sure who I asked or what time. Without these facts I simply tried to skip to the next question during my deposition." (ECF No. 75).

Plaintiff's Affidavit further states: "I, Gary Max Chambers, believe that this sworn Affidavit and the Attached incident report should prove that Clark Counties Grievance Policy and

Procedure is not only inadequate, but I know from my own personal experience that even asking for a grievance in Clark County Detention Center, Clark County, Arkansas put an inmate in immediate risk of substantial physical harm."  (ECF No. 75).

## II.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

### A. Clark County Defendants' Motion for Summary Judgment

The Clark County Defendants contend they are entitled to summary judgment with respect to Plaintiff's claims. (ECF No. 43). Specifically, the Clark County Defendants argue that:

- Plaintiff failed to exhaust his administrative remedies as to his claims of excessive force;

- There is no proof of any personal involvement by certain Defendants;

- The force used was reasonable in light of the circumstances;

- The Defendants are entitled to qualified immunity; and,

- There is no basis for official capacity / county liability.

The Plaintiff opposes the Clark County Defendants' Motion.

### 1. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Id.* at 218 (internal quotation marks and citation omitted). The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." *Lenz v. Wade*, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

The Eighth Circuit has recognized two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or (2) when the officials themselves fail to comply with the grievance procedures. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (citing *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) (explaining a prisoner is only required to exhaust those administrative remedies that are available and any remedies that prison officials prevent a prisoner from utilizing are not considered available)).

There is no dispute that the CCDC had a grievance procedure in place for detainees to use at the time of the incidents occurred which Plaintiff claims resulted in a violation of his rights. (ECF No. 45-6). It is also undisputed that Plaintiff failed to file a grievance with respect to either incident. However, although the Defendants argue that Plaintiff is not sure whether he even requested a grievance form, Plaintiff's deposition and affidavit testimony states otherwise. Specifically, Plaintiff states: "I, Gary Max Chambers, know that I did in act ask for grievance forms a few times when I was in jail in Clark County between April the 19th and April 23rd of 2018. I do not remember exactly who I asked or when. I remember asking while I was in the restraint chair but not sure who I asked or what time." (ECF No. 75). Further Plaintiff states, "that Clark Counties grievance policy and procedure is not only inadequate, but I know from my own personal experience that even asking for a grievance in Clark County Detention Center, Clark County, Arkansas put an inmate in immediate risk of substantial physical harm." *Id.*

As set forth above, the Eighth Circuit has recognized exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or (2) when the officials themselves fail to comply with the grievance procedures. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005). Here, Plaintiff has alleged that both that officials prevented him from utilizing the grievance procedure (by not providing a grievance form) *and* that

officials themselves failed to comply with the grievance procedures (by not providing a grievance form).  The Defendants have failed to refute Plaintiff's deposition and affidavit testimony.  I, therefore, find that Defendants have failed to establish that they are entitled to the affirmative defense of exhaustion of administrative remedies.

### 2.  Personal Involvement of the Defendants

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability on the part of a defendant, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights."  *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted).  The Defendants argue that Plaintiff could only describe what three of the Defendants allegedly did to him (Defendants Jones, Morrison, and Perry).  Defendants further argue that there is no evidence that Sheriff Watson, Jail Administrator Barnes, Chief Deputy Funderburk, Deputy Kersey, Deputy Love, or Deputy Samuels were personally involved in either of the two alleged incidents of excessive force from which the Plaintiff claims injury.

Having reviewed the entirety of the pleadings, it is clear that with respect to Sheriff Watson, Plaintiff has set forth no evidence to establish personal liability with respect to either of Plaintiff's claims for excessive force.  Plaintiff states:  that Sheriff Watson threatened him verbally in the booking area; that he believes Sheriff Watson "gave orders" to other officers with respect to the alleged night incident following his removal from the "drunk tank"; and, that although Sheriff Watson was not physically present during the night incident, Sheriff Watson verbally threatened Plaintiff during the incident over the car radio.  "[M]ere verbal threats made by a state-actor do not constitute a § 1983 claim."  *Hopson v. Fredericksen*, 961 F.2d 1374, 1378 (8th Cir. 1992). Further, Plaintiff's conclusory allegations that Sheriff Watson "gave orders" which instigated the

night incident are simply not enough to support liability. *See Springdale Educ. Ass'n v. Springdale School Dist.*, 133 F.3d 649, 651 (1998)("At a minimum . . . a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations.").

Similarly, I find that Plaintiff has set forth no facts sufficient to find liability with respect to Jail Administrator Barnes. Although Plaintiff appears to allege that Barnes was present in the booking area during times surrounding the first incident, Plaintiff makes no allegations against Barnes with respect to the first incident. Further, regarding the night incident, Plaintiff is clear that Barnes was not present. *See Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007).

However, although Plaintiff pleadings, deposition, and affidavit testimony are unclear as to Jones, Funderburk, Kersey, Love and Samuels' direct actions during the night incident, Plaintiff consistently maintains that each Defendant was present. Without any evidence from the Defendants to the contrary, I find that at a minimum, Plaintiff's facts support a claim for failure to protect from excessive force. An officer may be liable for failing to act or intervene to prevent excessive force by another officer if "'(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009)(quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)).

### 3. Reasonable Force in Light of the Circumstances

The Clark County Defendants next argue that Defendant Jones is entitled to summary judgment with respect to Plaintiff's third claim because the level of force used by Jones was reasonable in light of the circumstances. Plaintiff's third claim, which is stated only against Jones, concerns the incident following Plaintiff's book-in at the CCDC on April 20, 2018. At the time, Plaintiff was a pretrial detainee.

The Supreme Court has held that a pretrial detainee's excessive force claim should be analyzed under an objective reasonableness standard. *Kingsley v. Hendrickson*, et al, ___ U.S. ___, 135 S. Ct. 2466, 2473 (2015). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* (*quoting Graham v. Connor*, 490 U.S. 386, 396 (1989)). The determination should be made:

> from the perspective of a reasonable officer on the scene. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (*quoting Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests such as maintaining order and security. *Id.*

In determining whether a given use of force was reasonable or excessive, the Court held that the following may bear on the issue:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* The Court noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force." *Id.*

Not every push or shove rises to the level of a constitutional violation. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). "Section 1983 is intended to remedy only egregious conduct and not every assault or battery which violates state law will create liability under it." *Askew v. Millerd*, 191 F.3d 953, 958 (8th Cir. 1999).

Given the standards set forth above, the incident following Plaintiff's book-in does not rise to the level of a constitutional violation. According to the Plaintiff's deposition testimony, the incident occurred while Plaintiff was frustrated because he felt like Parrott unreasonably required Plaintiff to "squat and cough" multiple ties and "was trying to irritate him." As evidenced by the video and as confirmed by Plaintiff's deposition testimony, the incident began when the Plaintiff attacked Parrott from behind, pushing and swinging at the officer. Burdett and Jones then joined in, with reasonable attempts to restrain Plaintiff. Although Plaintiff testified that he had three cops striking him in the face, Plaintiff also testified that he was resisting the officers. Plaintiff testified that it was wrong for Jones to use force against him because Jones struck Plaintiff in the face with a closed fist. While it is accurate that Jones struck Plaintiff more than once, Plaintiff continued to resist throughout the incident, even spitting at the officers while being restrained. Less than two (2) minutes elapsed from the time Plaintiff attacked Parrott from behind to the time that the officers regained control of Plaintiff and had Plaintiff back onto his feet.

I find that the force used by Jones during the incident following Plaintiff's book-in was not excessive and was reasonable in light of the circumstances. For this reason, I recommend that summary judgment should be granted with respect to Officer Jones[3] to this extent.

### 4. Qualified Immunity

The Clark County Defendants next argue that they are entitled to qualified immunity with

---

[3] In Plaintiff's pleading entitled Motion to Dismiss Plaintiff's Response to Motion for Summary Judgment (ECF No. 71), he seems to seek to add two Defendants to this action: Officer Parrot and his public defender, Winston Clint Mathis. Plaintiff's request to add a Defendant is not timely and would be futile. As set forth above, I find that the force used during the April 20, 2018, incident following Plaintiff's book-in was reasonable by all officers involved. Further, the Supreme Court has held that a public defender does not act under color of state law, as required by 42 U.S.C. § 1983, when performing a lawyer's traditional functions as counsel to indigent defendants in state criminal proceedings. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981).

respect to their actions.  Analyzing a claim of qualified immunity requires a two-step inquiry. *Jones v. McNeese,* 675 F.3d 1158, 1161 (8th Cir. 2012).  "An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Robinson v. Payton,* 791 F.3d 824, 828 (8th Cir. 2015). "Unless the answer to both these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009).

As set forth above, I find that the Plaintiff has failed to set forth facts to prove a constitutional injury with respect to Sheriff Watson and Jail Administrator Barnes.  In addition, I find that the undisputed facts establish that the amount of force Defendant Jones used during the incident following Plaintiff's book-in was reasonable in light of the circumstances.  I, therefore, find that Sheriff Watson and Jail Administrator Barnes are entitled to qualified immunity with respect to Plaintiff's personal capacity claims against them.  I also find that Defendant Jones is entitled to qualified immunity with respect to his actions during the incident following Plaintiff's book-in on April 20, 2018.

Qualified immunity is not appropriate at this time with respect to Plaintiff's other personal capacity claims against the Clark County Defendants as questions of fact remain.   As set forth above, although Plaintiff is unclear about whether Jones, Funderburk, Kersey, Love and Samuels actively participated in any physical force against Plaintiff during the night incident.  However, Plaintiff consistently maintains that each Defendant was present.  The Defendants have presented no affidavit or deposition testimony to the contrary.   I find that it is clearly established that an officer may be liable for failing to act or intervene to prevent excessive force by another officer if "'(1) the officer observed or had reason to know that excessive force would be or was being used,

and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009)(quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)); *see also Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009)(finding that it is clearly established that a state actor may be liable if he fails to intervene to prevent the unconstitutional use of force). I, therefore, find that Separate Defendants Jones, Funderburk, Kersey, Love and Samuels are not entitled to qualified immunity with respect to the April 20-21, 2018 night incident.

The Clark County Defendant admit that questions of fact remain with respect to action of Separate Defendants Morrison and Perry during the night incident. (ECF No. 44). Further, the Clark County Defendants do not seek summary judgment based on qualified immunity with respect to Morrison and Perry. *Id.*

### 5. Official Capacity Claims

Finally, the Clark County Defendants argue that there is no basis for official capacity liability and therefore seek summary judgment in that respect.

As set forth above, on each of his claims stated against Clark County Defendants, the Plaintiff has sued the Defendant in his official capacity as well as his personal capacity. Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, these official capacity claims against are treated as claims against Clark County. *See Murray v. Lene,* 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish any liability on the part

of Clark County under section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). To establish the existence of an unconstitutional policy, the Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Plaintiff has failed to produce evidence of any policy or custom of Clark County that contributed to the alleged violation of Plaintiff's constitutional rights. Accordingly, I find that the Clark County Defendants are entitled to summary judgment on Plaintiff's claims against them in their official capacities.

### B. Separate Defendant Tommy Waldron's Motion for Summary Judgment

Plaintiff's claim against Separate Defendant Tommy Waldron concerns an incident that Plaintiff asserts took place on July 2, 2017. Plaintiff claims that Waldron "came to my house to use his gun and badge so I would lay down, and 2 other people could beat me up." (ECF No. 7). Plaintiff testified that earlier in the day, he had gotten into an altercation with Andrew Barrett, a civilian. Later Waldron came to his house with Barrett and Barrett's father. Plaintiff testified that he was ordered to lay down on the ground, and that after he did so, the two civilian men came running up within a few feet of him. Plaintiff jumped up and grabbed a stick, allegedly to protect himself from the two civilian men, and was tased by Waldron. Plaintiff testified that he ripped the wires out of the taser and was then shot with the taser again. Waldron instructed Plaintiff to get back on the ground, but the Plaintiff refused and asked for another officer to be called. Plaintiff was held by Waldron for approximately thirty (30) minutes until other officers arrived. Plaintiff was then arrested and charged with battery and criminal mischief.

Separate Defendant Waldron has submitted no testimony or other evidence to contradict Plaintiff's allegations and deposition testimony.

In Waldron's motion for summary judgment, he argues that he is entitled to summary judgment because the force he used was reasonable under the circumstances. Alternatively, Waldron argues that he is entitled to qualified immunity in this regard. Finally, Waldron argues that there is no basis for official capacity liability.

### 1. Reasonable Force / Qualified Immunity

Plaintiff's excessive force claim is based on his verified allegation that Waldron "came to my house to use his gun and badge so I would lay down, and 2 other people could beat me up." (ECF No. 7). Plaintiff's allegation is bolstered by his deposition testimony that after he initially complied with Waldron's command to lay on the ground, Andrew Barrett and Barrett's father ran up within a few feet of him. As set forth above, Separate Defendant Waldron has submitted no testimony or other evidence to contradict Plaintiff's allegations and deposition testimony.

Although it is conceivable that the force used by Waldron could be reasonable as Plaintiff admittedly disobeyed Waldron's commands to stay on the ground, certainly, if Waldron's actions are consistent with Plaintiff's verified allegations and deposition testimony, his use of force was a clear violation of Plaintiff's constitutional rights. Accordingly, I find that questions of fact prevent entry of summary judgment on the basis of either reasonable force or qualified immunity.

### 2. Official Capacity

Plaintiff has sued Waldron in his official capacity as well as his personal capacity. Waldron argues that there is no basis for official capacity liability and seeks summary judgment in that respect.

As set forth above, official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, Plaintiff's official capacity claims against Waldron is treated as a claim against Clark County or the City of Amity. *See Murray v. Lene,* 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish any liability on the part of a municipality under section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). To establish the existence of an unconstitutional policy, the Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Plaintiff has failed to produce evidence of any policy or custom of Clark County or the City of Amity that contributed to the alleged violation of Plaintiff's constitutional rights. Accordingly, I find that Waldron is entitled to summary judgment on Plaintiff's claim against him in his official capacity.

## IV. CONCLUSION

For the reasons stated above, I recommend that the Clark County Defendants' Motion for Summary Judgment (ECF No. 43) be **granted, in part, and denied, in part**, as follows:

- the Motion is **granted** as to Plaintiff's personal liability claims against Sheriff Jason Watson and Derrick Barnes;

- the Motion is **granted** as to Plaintiff's personal liability claim against Robert Jones with respect to the book-in incident as set forth in claim three (3) of the Amended Complaint;  and,

- the Motion is **granted** as to all of Plaintiff's official capacity claims against the Clark County Defendants;

- the Motion is **denied** as to Plaintiff's personal liability claims against Robert Jones, Nick Funderburk, Chase Kersey, Officer K. Love, Andrew Samuels, Nate Morrison, and Deputy Perry with respect to the night incident as set forth in claim one (1) of the Amended Complaint.

I further recommend that Separate Defendant Tommy Waldron's Motion for Summary Judgment (ECF No. 47) be **granted, in part, and denied, in part**, as follows:

- the Motion is **denied** as to Plaintiff's personal liability claims against Waldron;  and,

- the Motion is **granted** as to Plaintiff's  official capacity claims against Waldron.

Finally, I recommend that the following claims remain for trial in this matter:

- Plaintiff's personal liability claims against Robert Jones, Nick Funderburk, Chase Kersey, Officer K. Love, Andrew Samuels, Nate Morrison, and Deputy Perry with respect to the night incident as set forth in claim one (1) of the Amended Complaint;  and,

- Plaintiff's personal liability claims against Separate Defendant Tommy Waldron as set forth in claim two (2) of the Amended Complaint.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are**

reminded that objections must be both timely and specific to trigger de novo review by the

district court.

DATED this 3rd day of February 2020.

/s/ *Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE